ELLICOTT MACHINE CORPORATION
v. UNITED STATES.

No. 46285.

Court of Claims.
July 7, 1947.

Harry D. Ruddiman, of Washington D. C. (King & King, of Washington, D. C., on the briefs) for plaintiff.

Gaines V. Palmes, of Washington, D. C., John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and MADDEN, WHITAKER, LITTLETON, and JONES, Judges.

JONES, Judge.

The plaintiff seeks a refund of a portion of the transportation and insurance charges on articles sold to defendant. The case involves the interpretation of a contract as modified by a change order.

On January 14, 1942 the plaintiff entered into a contract with the defendant to supply certain dredge parts to be delivered free of all charges on the dock at Cristobal, Canal Zone. In computing its bid, plaintiff calculated its shipping costs on the basis of transportation from its plant at Baltimore, Maryland, to New York by rail and then to Cristobal by steamer. Before any parts could be shipped the Port of New York was closed to shipments to the Panama Canal and it became necessary to use other routes.

On July 7, 1942 a change order was issued by defendant and accepted by the plaintiff by which the contract was modified to provide for the delivery of the dredge parts at the manufacturer's plant in Baltimore instead of Cristobal, the change order further providing that the shipping costs to Cristobal, Canal Zone, which the plaintiff would otherwise have had to pay, be deducted from the payments made under the contract.

The present controversy relates to the amount of the deductions for shipping costs made by the defendant under the contract as modified by the change order. Plaintiff urges that these were excessive, and asks for reimbursement. The defendant's position is that the deductions were correct and plaintiff cannot recover.

There is no dispute as to the facts in the present situation, except as to the materiality of some of them. We have included in our findings those facts which we think are sufficient in the present instance.

A chronological review of the circumstances relating to the present issue begins with the issuance of an invitation for bids for furnishing dredge parts to be delivered free of all charges at Cristobal, Canal Zone. Such invitation was issued on December 30, 1941. At that time the United States was at war with both Germany and Japan, and German submarines were at large in the Atlantic, a background of which we take judicial notice. Pursuant to this invitation plaintiff submitted a bid for furnishing the articles delivered at the Canal Zone for the sum of $284,436.

For twenty years plaintiff had customarily made shipments to Cristobal from its plant in Baltimore to New York by rail thence by the Panama Railroad Steamship Line to Cristobal. At the time plaintiff submitted its bid the Panama Railroad Steamship Line was making regular shipments from New York to Cristobal. By such route the freight rate was $1.49 per cwt. and war-risk insurance was $0.30 per cwt. and plaintiff calculated its shipping costs on this basis.

It is plaintiff's position that the invitation for bids, which became a part of the contract, provided that shipments through New York should be routed via the Panama Railroad Steamship Line and that the parties contemplated that shipments should be made by the customary route via New York, and that plaintiff could not be compelled to ship from another port without an adjustment of the contract price for the increased cost of transportation.

We find nothing to support such contention, and we quote in part from the invitation for bids, as follows: "Quotations should include the above property packed and secured for ocean shipment and delivered by Steamer of American Registry, free of all charges, on dock at either Cristobal (Atlantic port) or Balboa (Pacific port), Canal Zone, Isthmus of Panama. Shipments through New York shall be

routed via Panama Railroad Steamship Line."

While this clearly specifies that shipments through New York "shall be routed by the Panama Railroad Steamship Line," this is but a designation of the ocean carrier to be used in case of shipments through New York. There is nothing that restricts shipments to a route via New York.

That the shipping route upon which bids were to be predicated was not limited to New York but was entirely optional to the bidder is also evident from the "Special Conditions" forming a part of the invitation. These Special Conditions included a reference to shipment through the Pacific Coast ports, as follows: "In view of shipping conditions now existing on the Pacific Coast, the requirement that shipment be made by steamer of American Registry is hereby waived if shipment is made through Pacific Coast ports."

Plaintiff's bid was accepted on January 14, 1942, and a formal contract bearing that date was sent to plaintiff for its signature.

It appears that plaintiff was fully aware of the precarious delivery obligations it was about to assume, for instead of signing the contract, plaintiff returned it to the defendant unsigned, accompanied by a letter. This letter, dated January 20, 1942, and fully set forth in our Finding 6, requested that the contract be modified to provide that in the event of any increases beyond the freight rate of $1.49 and insurance rate of $0.30 such increases would be borne by the Panama Canal. In this connection it is to be noted that plaintiff was already protected against increases in the ocean freight rates by the Special Conditions as quoted in our Finding 3.

The General Purchasing Office of the Panama Canal by a letter of January 2, 1942, declined plaintiff's request to modify the contract and returned the same to plaintiff. Promptly thereafter plaintiff signed the contract as originally presented, and returned it to the defendant. As we see it, it then became plaintiff's responsibility under the contract to make delivery at the Canal Zone through any available transportation route.

In April of 1942 and before the first shipment of parts was made, the Port of New York was closed to shipments to the Panama Canal because of the submarine menace. On April 22, 1942, plaintiff initiated correspondence with the Panama Canal, this being set forth in our Finding 9. Plaintiff reviewed the difficulties surrounding deliveries and suggested a modification of the existing contracts which it had with the defendant so as to provide for acceptance of parts at Baltimore instead of Cristobal, with appropriate adjustments for the shipping expenses. An alternative suggested by plaintiff was that of providing for shipments via New Orleans, plaintiff's letter stating that such a modification would likewise call for adjustments in the price owing to differences in cost of transportation.

These communications were replied to by the contracting officer on May 6, 1942. In this letter plaintiff was advised that shipping space was obtainable on vessels sailing from New Orleans and that circumstances did not appear to require a modification of the contract.

On May 7, 1942, plaintiff forwarded a shipment of dredge parts by rail from Baltimore to New Orleans, to be transported by ocean carrier from that port to the Panama Canal. By the time this shipment reached the docks at New Orleans, however, ocean passage was not available and thereafter the Port of New Orleans was sporadically closed and open, depending upon the activity of enemy submarines in the Gulf of Mexico. This shipment remained at New Orleans until subsequent to the change order. It was then released to the defendant who transported it at some later date to the Panama Canal.

As our opening statement indicates, the change order was issued on July 7, 1942, and provided for delivery of the parts at the manufacturer's plant instead of at Cristobal. The pertinent part of the change order is contained in the following sentence: "There shall be deducted from payments under this contract, the shipping

costs which the contractor would have been required to pay had the shipments and delivery been made to Cristobal, C. Z."

Following the issuance of this change order, which was accepted by plaintiff, the defendant accepted deliveries at plaintiff's plant and handled its own shipments on Government bills of lading. This change order was without question of mutual benefit to both parties. It enabled plaintiff to receive its payments for the material more promptly, and the Government was obviously in better position to expedite the shipments than plaintiff, a private corporation, who would have had to struggle with priorities and regulations. We find nothing ambiguous in the phraseology of the change order.

After acceptance at Baltimore by the defendant, the material was shipped to the Canal Zone either by way of New Orleans, or Wilmington, California, depending upon the exigencies of the war situation and the availability of shipping space. Fifteen shipments were made—seven by way of New Orleans and eight by way of Wilmington, California. The Port of New York remained substantially closed during the entire period of these shipments.

On the fifteen shipments made, the plaintiff on its invoices deducted the costs of shipment based on the route via New York upon which its bid had been predicated. The defendant, however, based its deductions upon rail and ocean freight through New Orleans and added to such deductions the total cost of marine insurance of $727.89, and paid plaintiff on the basis of such deductions.

Defendant's deductions exceeded those made by the plaintiff by $9,346.89, which is the sum plaintiff seeks to recover. This includes the marine insurance item, the remainder of the difference, $8,619, consisting of $8,580.31 for freight and handling charges and $38.69 for war-risk insurance.

■ While the contract obligated plaintiff to include the war-risk insurance as a part of the shipping costs, we find nothing in the invitation to bidders, the contract or the change order obligating plaintiff to also assume the cost of marine insurance. If plaintiff had made its deliveries at Cristobal as originally contemplated, it might well have taken out such insurance upon the material. On the other hand, it was free to assume this risk. Defendant was therefore in error in deducting the sum of $727.89 for marine insurance as a part of the required shipping costs and plaintiff should be reimbursed to this extent.

■ As to the remainder of the amount sued for, plaintiff is not entitled to any reimbursement. Plaintiff had contracted to assume the shipping costs and war-risk insurance from Baltimore to Cristobal. Had the change order not been issued, plaintiff with the closing of the Port of New York would have had to ship through New Orleans, or even through a more distant port and pay the shipping costs.

As a matter of fact, we feel that defendant was quite liberal in its treatment of plaintiff in basing deductions on all shipments through New Orleans when approximately one-half of the shipments was made via Wilmington, California, the Government absorbing the difference between these higher shipping costs and the costs via New Orleans.

Plaintiff attempts to make a point of the fact that in its first six invoices it made deductions on the basis of shipping via New York and these invoices were paid by the defendant as rendered, and not until the seventh invoice did defendant withhold a sum to apply against increased deductions on the previously submitted invoices on the basis of shipments via New Orleans. This however is explained by the testimony of the Assistant Comptroller of the Panama Canal, who had overlooked the fact that the contract involved in this suit did not provide for a deduction of freight charges at $1.49 per cwt. as did a number of other contracts with plaintiff upon which payments were being made, and this error was not discovered until the payment of the seventh invoice.

The plaintiff pursuant to renegotiation proceedings and on the respective dates of September 28, 1943 and November 13, 1944, entered into two agreements with the Gov-

ernment relating to the elimination of excessive profits for the calendar years 1942 and 1943. As the result of these, plaintiff repaid to the Government certain sums as excessive profits.

The defendant urges that the execution of these two renegotiation agreements acts as a bar or an estoppel of the payment of any claim arising out of the contract forming the basis of the present suit. This is on the theory that the plaintiff having agreed with the defendant as to its total compensation for these years, this court lacks jurisdiction to increase plaintiff's compensation and thus alter the renegotiation agreements.

The renegotiation agreements which have been filed before us as documentary evidence on behalf of defendant in no way specify what contracts were considered in the proceedings, and while we have the statement or admission of plaintiff's counsel in the record that the amount sued for in the present case was included in the renegotiation proceedings, there is absolutely no evidence as to how this sum was treated and whether it was considered as cost or income. In this respect it is also pointed out that the renegotiation agreements were for the calendar years 1942 and 1943, whereas the last invoice under the contract forming the basis of the present case was not submitted until January 12, 1944.

Each of the renegotiation agreements moreover provides for subsequent contingencies. The 1942 agreement permits the chairman of the Price Adjustment Board in his discretion to reopen and modify the agreement if it shall develop that the statements furnished by plaintiff do not correctly show the true operating results and financial condition of the plaintiff. The 1943 agreement provides for the payment of additional profits to the Government if the contractor shall either receive a refund or shall recognize a reduction in its liability in respect of any item which was allowed as an item of cost.

■ To bar recovery because of the renegotiation agreements, as requested by the defendant, this court would in effect rule that any compensation due plaintiff in the present suit was an excessive profit. Ob-

viously, this court is without jurisdiction to determine excessive profits.

Plaintiff is entitled to recover the sum of $727.89, deducted by defendant for marine insurance. Judgment will be entered for this amount. It is so ordered.

MADDEN, WHITAKER, and LITTLETON, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.